SLIP OP. 07-74
UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUSTEEL COMPANY, LIMITED and<br>SEAH STEEL CORPORATION, LIMITED,<br><br>               Plaintiffs,<br><br>         v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>   and<br><br>IPSCO TUBULARS, INCORPORATED, LONE<br>STAR STEEL COMPANY, INCORPORATED, and<br>MAVERICK TUBE CORPORATION,<br><br>             Defendants-Intervenor. | **Before: Gregory W. Carman,<br>Judge**<br><br>Court No. 06-00075 |

[Plaintiffs' Motion for Oral Argument is DENIED; Plaintiffs' Motion for Judgment upon the Agency Record is GRANTED; Commerce's final determination in the administrative review of Oil Country Tubular Goods from Korea is REMANDED.]

    Troutman Sanders LLP (Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Jeffery S. Grimson, and Brady W. Mills) for Plaintiffs.

    Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David F. D'Alessandris), for Defendant.

    Schagrin Associates (Roger B. Schagrin, Brian E. McGill, and Michael J. Brown), for Defendants-Intervenor.

May 15, 2007

OPINION & ORDER

CARMAN, JUDGE: The matter before this Court is Plaintiffs' Husteel Co., Ltd. ("Husteel") and

SeAH Steel Corp., Ltd. ("SeAH") Rule 56.2 Motion for Judgment upon the Agency Record

("Motion for Judgment upon the Agency Record").  Plaintiffs challenge the Department of

Commerce's ("Commerce") decision to exclude certain of Plaintiffs' sales price data from the

calculation of normal value during the ninth administrative review of the antidumping order on

Oil Country Tubular Goods ("OCTG") from Korea.[1]  Because Commerce's decision to exclude

the data is not supported by substantial evidence on the record, this Court grants Plaintiffs'

Motion for Judgment upon the Agency Record and remands to Commerce the final results in <u>Oil</u>

<u>Country Tubular Goods, Other Than Drill Pipe, from Korea</u>, 71 Fed. Reg. 13,091 (Dep't

---

[1]During an administrative review, Commerce is tasked with calculating a respondent's dumping margin for merchandise subject to an antidumping order ("subject merchandise").  A respondent's dumping margin is the "amount by which the normal value exceeds the export price" for the subject merchandise.  19 U.S.C. § 1673 (2000).

The normal value of subject merchandise is the price at which the respondent first sells the merchandise for consumption in the respondent's home market.  Where home-market price is not available, Commerce will use the price at which the respondent first sells the merchandise for consumption in a third country, if: (a) the price is "representative;" (b) the sales are of sufficient aggregate quantity or value; and (c) Commerce does not determine that a "particular market situation" in the third country prevents a proper comparison with the export price.  19 U.S.C. § 1677b(a)(1)(B)(ii) (2000).  If there are multiple third-country markets with eligible prices, Commerce selects as the comparison market the country with the highest volume of sales of subject merchandise that is most similar to that sold in the United States.  19 C.F.R. § 351.404(e) (2006).  If neither home-market nor third-country price is available, Commerce will calculate a constructed value for normal value, based on the <u>cost</u> of producing the merchandise.  19 U.S.C. § 1677b(a)(4).

The export price of subject merchandise is "the price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise . . . to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States."  19 U.S.C. § 1677a(a) (2000).

Commerce Mar. 14, 2006) (final results of antidumping duty administrative review) ("Final

Results") for action consistent with this opinion.


## PROCEDURAL HISTORY

Plaintiffs participated as foreign respondents in the underlying administrative action

giving rise to this case, the ninth administrative review of the antidumping order on Oil Country

Tubular Goods ("OCTG") from Korea.  In the Final Results of the administrative review, and

over Plaintiffs' objections, Commerce excluded from the respective calculations of normal value

Plaintiffs' sales of OCTG to Korean trading companies that subsequently exported the

merchandise to the People's Republic of China ("China").  Plaintiffs timely sought judicial

review of the issue in this Court.


## BACKGROUND

A.      Plaintiffs' Sales During the Period of Review

Plaintiffs are Korean manufacturers of OCTG that is subject to an antidumping duty

order.  See Final Results, 71 Fed. Reg. at 13,091.  Each Plaintiff reported to Commerce its sales

of OCTG during the period of review, August 1, 2003 through July 31, 2004, in order for

Commerce to use those sales to calculate each Plaintiff's normal value.  Husteel reported that it

did not sell OCTG for consumption in the Korean home market during the period of review.

(Resp. of Husteel Co., Ltd. to Section A of the Dep't of Commerce's Antidumping Duty

Questionnaire 1 (Jan. 5, 2005) ("Husteel's Section A Resp."), Pub. R. Doc. 25.)  SeAH reported

that it sold OCTG for consumption in the Korean home market, but that those sales could not be

used to calculate SeAH's normal value because they accounted for less than five percent of the

volume of the company's sales to the United States.  (Resp. of SeAH Steel Corp., Ltd. to Section

A of the Dep't of Commerce's Antidumping Duty Questionnaire A-3 (Jan. 5, 2005) ("SeAH's

Section A Resp."), Pub. R. Doc. 26.)  Because neither Plaintiff reported viable home-market

sales on which to base its normal value,[2] Plaintiffs also reported their sales to third countries.

Husteel reported that its only third-country market was China.  (Husteel's Section A Resp. 3.)

SeAH reported third-country sales to Canada, China, and Myanmar, though the reported sales to

Myanmar fell below the five percent threshold for viability.[3]  (SeAH's Section A Resp. A-3.)

Each Plaintiff reported that China was its largest third-country market and that the quantity of

OCTG it sold exceeded the five percent threshold for China to be considered a viable third-

country market for purposes of calculating normal value.  (Husteel's Section A Resp. 3; SeAH's

Section A Resp. A-3.)

     Plaintiffs explained to Commerce that the sales they reported as "Chinese" were actually

made to unaffiliated trading companies operating in Korea that resold the merchandise to buyers

in China.  (Husteel's Section A Resp. 11; SeAH's Section A Resp. A-14.)  Plaintiffs reported the

sales to Korean trading companies as sales to China, rather than home-market sales, because

---

     [2]In order for the home market to be considered viable, the quantity (or value) or the merchandise sold for consumption in the home market must account for five percent or more of the aggregate quantity (or value) of the subject merchandise sold to the United States.  19 U.S.C. § 1677b(a)(1)(C)(ii) (2000).

     [3]As with home-market sales, the quantity (or value) or the merchandise sold to the third country must account for five percent or more of the aggregate quantity (or value) of the subject merchandise sold to the United States in order for a third-country market to be considered viable. 19 U.S.C. § 1677b(a)(1)(B)(ii)(II).

Plaintiffs knew at the time of sale that the merchandise would be resold to China.[4]  However,

Plaintiffs reported to Commerce the invoice price between Plaintiffs and the respective Korean

trading companies, not the invoice price between the Korean trading companies and their

Chinese customers.  (Br. in Supp. of Pls.' Husteel Co. Ltd. & SeAH Steel Corp. R. 56.2 Mot. for

J. upon the Agency R. ("Pls.' Br.") 3-4; see also Def.'s Mem. in Opp'n to Pls.' Mot. for J. upon

the Agency R. ("Def.'s Mem.") 13 (confirming that "[w]here the producer sells through a reseller

with knowledge of the destination, it is the price between the producer and the reseller . . . that is

. . . used in the dumping analysis").)

        During Commerce's verification of Plaintiffs' data, the agency found no discrepancies

between the price data Plaintiffs reported to Commerce for their sales to the Korean trading

companies and the documentation relating to those sales.  (See Verification of Costs & Sales for

Husteel Co., Ltd. in the Admin. Rev. of Oil Country Tubular Goods, Other than Drill Pipe, from

Korea 13 (Dec. 28, 2005), Pub. R. Doc 95; Verification of Costs and Sales for SeAH Co., Ltd. in

the Admin. Rev. of Oil Country Tubular Goods, Other than Drill Pipe, from Korea 8 (Dec. 28,

2005), Pub. R. Doc. 96.)

        Plaintiffs also explained to Commerce the sales process they employed with the Korean

trading companies.  First, a Korean trading company requested a price quote for a specific

quantity, specification, and delivery date for OCTG.  (Husteel Confid. Verification Exh. 21 at 1,

---

        [4]Commerce requires that respondents classify sales as to a third country if, when the seller
negotiates the sale, the seller knows, or should have known, that the merchandise will be
exported to a third country.  See LG Semicon Co., Ltd. v. United States, 23 CIT 1074, 1075
(1999) (holding that a respondent must report a sale as to the United States rather than as a home-
market sale where the respondent knew at the time of sale to a buyer located in the home market
that the subject merchandise would be resold to the United States).

3-4A, Confid. R. Doc 60; SeAH Confid. Verification Exh. 7 at A-B, Confid. R. Doc. 59); <u>see</u>

<u>also</u> Pls.' Br. 4.  Plaintiffs then made an offer to the Korean trading company.  If Plaintiffs' offer

was accepted by the Korean trading companies, Plaintiffs and the Korean trading companies

entered a contract.  Plaintiffs delivered the OCTG to the trading company at the Korean port of

departure, whereupon the trading company paid for the merchandise.  (Husteel Confid.

Verification Exh. 21 at 4-4A; SeAH Confid. Verification Exh. 7 at B).  Plaintiffs represented to

Commerce that they were not involved in negotiating the price at which the trading companies

sold the OCTG to the Chinese buyers, and any claims made by the Chinese customers were made

to the Korean trading companies, not to Plaintiffs.  (Husteel Confid. Verification Exh. 21 at 3-

4A; SeAH Confid. Verification Exh. 7 at B).

B.      The Administrative Review

During the underlying administrative review, Plaintiffs argued that Commerce should use

their "Chinese"[5] sales to calculate normal value because the sales satisfy the three statutory

requirements set out in 19 U.S.C. § 1677b(a)(1)(B)(ii): (1) the sales are of sufficient quantity; (2)

the sales are not subject to a "particular market situation;" and (3) the price for those sales is

"representative," because Plaintiffs sold the OCTG in arm's-length, market-economy

transactions to unrelated Korean trading companies.  (<u>See</u>, <u>e.g.</u>, Letter from Kaye Scholer LLP to

the Hon. Carlos Gutierrez, Sec'y of Commerce (Jan. 17, 2006), Pub. R. Doc. 100.)

---

[5]As mentioned previously, the sales in question were not actually made to buyers in
China.  Plaintiffs sold OCTG to unaffiliated Korean trading companies, and the sales price data
Plaintiffs reported represented the invoice price between Plaintiffs and the Korean trading
companies, which this Court refers to as the "Chinese" sales price.

Commerce disagreed with Plaintiffs' assertion that the price of their sales is

"representative."  Commerce noted that China is classified as a nonmarket economy and that

"sales made in [nonmarket economies] are not representative because the prices for such sales

are not determined on the basis of market principles."  (Issues & Decision Mem. for the Final

Results of the Admin. Rev. of the Antidumping Duty Order on OCTG from Korea 8 (Mar. 7,

2006) ("Issues & Decision Mem.").)  Commerce explained that

> [nonmarket economy] prices, as a general rule, are not meaningful measures of
> value because they do not sufficiently reflect market-determined demand
> conditions or the relative scarcity of the resources used in production.
> Specifically, the demand and supply elements that individually and collectively
> make a market-based price system work and, as a consequence, make market-
> based prices and costs meaningful measures of value, are absent in [nonmarket
> economies.] Moreover, foreign suppliers to [nonmarket economies] are often
> competing with domestically set prices.  Therefore, sales into [a nonmarket
> economy] may very well not be at prices that reflect the fair value of the
> merchandise.  Therefore, sales prices into [a nonmarket economy] cannot be
> considered to be "representative," as required by the statute.

(Id. (internal citations omitted).)

On that basis, Commerce excluded China from serving as the third-country comparison

market to establish Plaintiffs' normal values.  Instead, Commerce used Canada as the third-

country comparison market on which to base SeAH's normal value.  Because Husteel's only

reported third-country sales were to China, Commerce calculated the company's normal value on

the basis of constructed value.

**PARTIES' CONTENTIONS**

A.      <u>Plaintiffs' Arguments</u>

Plaintiffs argue that Commerce should have used Plaintiffs' Chinese sales price data to calculate normal value because China was the third-country market into which Plaintiffs sold the largest volume of subject merchandise that was most similar to that sold in the United States. (Pls.' Br. 13.)  Husteel contends that China should be selected because the company "had no other viable third country market."  (<u>Id.</u> at 14.)  SeAH argues that China should be selected because the volume of merchandise sold to China was significantly greater than the volume sold to the other viable third-country market, Canada, and "more importantly, the OCTG sold by SeAH for export to both China and the United States was plain-end pipe, while the OCTG sold to Canada was threaded and coupled and thus not as similar as the exports to China."  (<u>Id.</u>)

Plaintiffs assert that Commerce's decision to exclude Plaintiffs' Chinese sales is not supported by substantial evidence on the record and is not otherwise in accordance with law because "there is no basis in the law or on the facts of this case [to support] Commerce's determination" that Plaintiffs' sales are not "representative."  (Pls.' Br. 15.)  First, Plaintiffs point out that the sales in question occurred "between two unaffiliated companies in a market economy country," (<u>id.</u> at 17) and complain that "Commerce has not, and could not, point [sic] to any record evidence to support the notion that [Plaintiffs'] OCTG sales are anything but arm's-length prices to a market economy purchaser" (<u>id.</u> at 18).  Plaintiffs argue that "Commerce does not explain how the prices between two unaffiliated companies in a market economy country are influenced by the fact that the goods are ultimately delivered to China."  (<u>Id.</u> at 17.)

Second, Plaintiffs argue that in two previous antidumping administrative reviews (not

involving Plaintiffs) Commerce "used China as the third-country market for the purpose of

determining normal value." (Id. at 26.)  Moreover, Plaintiffs stress that Commerce regularly uses

prices from sales between a seller located in a market economy and a buyer located in a

nonmarket economy to calculate normal value:

> Pursuant to . . . Commerce's regulations [19 C.F.R. § 351.408(c)(1)], there is a
> preference for calculating normal value in [a nonmarket economy] case using
> prices paid by the [nonmarket economy] producer in a market economy currency
> to market economy suppliers for the [nonmarket economy producer's factors of
> production].[6]  Thus, contrary to the Final Results, Commerce does not reject
> prices from market economy suppliers simply because the purchaser is located in
> [a nonmarket economy].

(Id. at 20 (footnote added).)

B.     Defendant's and Defendants-Intervenor's Arguments[7]

Defendant (the "Government") contends that Commerce's decision to exclude Plaintiffs'

Chinese sales price data is supported by substantial evidence and is otherwise in accordance with

law.  The Government points out that the term "representative" is not defined in the statute or

regulations and argues that Commerce therefore has the latitude to interpret the term in a

---

[6]In nonmarket cases, antidumping cases where the respondent alleged to be dumping is
located in a nonmarket economy, Commerce "determin[es] the normal value of subject
merchandise on the basis of the value of the factors of production utilized in producing the
merchandise" plus an amount for expenses and profit.  19 U.S.C. § 1677b(c)(1) (2000).  Factors
of production are the resources used to manufacture a product or service, including labor, raw
materials, energy and utilities consumed, and capital costs.  Id. at (c)(3).

[7]Defendants-Intervenor repeat many of the arguments raised by Defendant.  (See
generally Opp'n of Def.-Intervenors to Pls.' Mem. in Supp. of Their R. 56.2 Mot. for J. on the
Agency R.)  This Court will therefore only refer to Defendant's arguments except in instances
where the arguments of the two parties differ.

reasonable manner.  (Def.'s Mem. 11.)  The Government argues that "sales between actors in

market economy countries cannot be compared to sales where one side of the transaction is a

nonmarket entity" (id.), and it is therefore reasonable for Commerce to find Plaintiffs' sales to be

unrepresentative.  Defendants-Intervenor add that record evidence demonstrates that Plaintiffs

sales were not made at market prices.  "The differential in prices between SeAH's Chinese sales

and their sales to market economies Canada and the United States supports Commerce's finding

that the prices of [P]laintiffs' Chinese sales are not representative of prices between a market-

economy buyer and a market-economy seller."  (Opp'n of Def.-Intervenors to Pls.' Mem. in

Supp. of Their R. 56.2 Mot. for J. on the Agency R. ("Defs.-Int.'s Mem.") 17.)

        In response to Plaintiffs' argument that the relevant sales in this case were not made to a

nonmarket entity, but, rather, to trading companies located in Korea, the Government states that

"Commerce properly determined that the involved sales were sales in China because [Plaintiffs]

had knowledge of the destination of the merchandise."  (Def.'s Mem. 13.)  The Government also

distinguishes the two instances cited by Plaintiffs where Commerce accepted Chinese sales data

to calculate a respondent's normal value.  The first instance "was decided pursuant to the pre-

[Uruguay Round Agreements Act] statute, which did not contain the requirement that prices be

'representative';" and no party raised the issue of the appropriateness of using Chinese prices as

the basis for normal value in the second instance.  (Id. at 22.)

        Further, the Government contends that Commerce does not regularly accept price data for

sales between market-economy suppliers and nonmarket-economy buyers to calculate normal

value.  The Government explains that Commerce accepts this data only to value factors of

production in nonmarket cases, but not to value the subject merchandise itself, which is what

Plaintiffs asked Commerce to do in the instant case.   Defendants-Intervenor add that the

standard of reliability for the price data differs in the two cases.  (Defs.-Int.'s Mem. 2.)  In the

instant case, the sale price of subject merchandise must be "'representative,'" whereas when

valuing factors of production, the price data need only be the "'best information available.'"  (Id.)

Defendants-Intervenor conclude that, "[t]here is, accordingly, good reason for Commerce's

different treatment of sales" in the two types of cases.  (Id. at 9.)

        Defendants-Intervenor lastly argue that even if this Court determines that the Chinese

sales prices are "representative," China would not be the proper third-country comparison market

for SeAH.  Defendants-Intervenor contend that Commerce should continue to use price data from

SeAH's Canadian sales to calculate SeAH's normal value because the merchandise the company

sold to Canada was more similar to the U.S. merchandise than that sold to China.  (Id. at 18-19.)


                                        JURISDICTION

This Court has jurisdiction to review Commerce's final determination in an administrative

review of an antidumping duty order pursuant to 28 U.S.C. § 1581(c) (2000).


                                    STANDARD OF REVIEW

        In reviewing a challenge to Commerce's final determination in an antidumping

administrative review, this Court will "hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Commerce's factual

determinations must be supported by substantial evidence on the record, Atl. Sugar, Ltd. v.

United States, 744 F.2d 1556, 1559 (Fed. Cir. 1984); its interpretations of the antidumping

statute must be in accordance with law, Chevron U.S.A., Inc. v. Natural Resources Defense

Council, 467 U.S. 837 (1984); Timken Co. v. United States, 354 F.3d 1334, 1341 (Fed. Cir.

2004).


## DISCUSSION

A.      Commerce's Interpretation of "Representative" is in Accordance with Law.

        This Court is first charged with determining whether Commerce's interpretation of the

statutory term at issue is in accordance with law.  Commerce's interpretation of the antidumping

statute is reviewed pursuant to the two-step process set forth in Chevron.  Under the first step, the

Court determines "whether Congress has directly spoken to the precise question at issue.  If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must

give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 842-43;

accord Timken, 354 F.3d at 1341.  If, however, "the statute is silent or ambiguous with respect to

the specific issue, the question for the court is whether the agency's answer is based on a

permissible construction of the statute."  Chevron, 467 U.S. at 843; accord Timken, 354 F.3d at

1342.  To determine whether Commerce's statutory interpretation is permissible, the court

considers several factors, including "the express terms of the provisions at issue, the objectives of

those provisions and of the antidumping scheme as a whole."  Mitsubishi Heavy Indus., Ltd. v.

United States, 22 CIT 541, 545, 15 F. Supp. 2d 807 (1998).

        Here, the statutory term at issue is "representative."  Commerce may use third-country

sales price data to calculate normal value provided–among other criteria–that "such price is

representative."  19 U.S.C. § 1677b(a)(1)(B)(ii)(I).  The court in <u>Alloy Piping Products, Inc. v.</u>

<u>United States</u>, 26 CIT 330, 339, 201 F. Supp. 2d 1267 (2002), found that "[n]either the statute,

legislative history, nor regulations define 'representative'."  The question for this Court, then, is

whether Commerce's interpretation is a permissible construction of the statute.

  Commerce defined the term "representative" to mean "determined on the basis of market

principles."[8]  (Issues & Decision Mem. 8.)  Commerce's interpretation appears consistent with

the purpose of the of the antidumping statute, which is to calculate dumping margins as

accurately as possible.  <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir.

1990).  To this end, Commerce ensures that normal value represents the fair value of subject

merchandise by requiring that the underlying price of the subject merchandise is "determined on

the basis of market principles." (Issues & Decision Mem. 8.)  As such, this Court holds that

Commerce's interpretation of "representative" is permissible.

B. <u>Commerce's Determination that Plaintiffs' Chinese Sales Were Not Representative is Not
  Supported by Substantial Evidence on the Record.</u>

  Commerce's factual determinations must be supported by substantial evidence on the

record.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a

---

  [8]Commerce has not defined "representative" through formal notice-and-comment
rulemaking.  However, in the underlying administrative review to this action, the agency found
"that the sales made in [nonmarket economies] are not representative because the prices for such
sales are not determined on the basis of market principles."  (Issues & Decision Mem. 8.)
Nevertheless, Commerce's interpretation of this statutory term warrants <u>Chevron</u> deference.  <u>See</u>
<u>Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States</u>, 268 F.3d 1376,
1381 (Fed. Cir. 2001) ("Even where Commerce has not engaged in notice-and-comment
rulemaking, its statutory interpretations articulated in the course of antidumping proceedings
draw <u>Chevron</u> deference.").

conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); accord Matsushita Elec.

Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).  An agency's determination is

not supported by substantial evidence where the agency fails to adequately explain the basis on

which the agency made its decision.  Viraj Forgings, Ltd. v. United States, 28 CIT __, 350 F.

Supp. 2d 1316, 1320 (2004) (agency action unlawful where the agency "failed to provide an

adequate basis for its conclusions"); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983) (agency action arbitrary and capricious[9] where the agency

has "entirely failed to consider an important aspect of the problem"); Elec. Consumers Res.

Council v. FERC, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (agency decisions must be "reached by

'reasoned decisionmaking,' including an examination of the relevant data and a reasoned

explanation supported by a stated connection between the facts found and the choices made").

Here, Commerce did not adequately explain its basis for finding that the prices of

Plaintiffs' sales to Korean trading companies are not "representative."  Commerce's explanation

began with the premise that "[nonmarket economy] prices, as a general rule, are not meaningful

measures of value because they do not sufficiently reflect market-determined demand conditions

or the relative scarcity of the resources used in production."  (Issues & Decision Mem. 8.)

Commerce then reasoned that "foreign suppliers to [nonmarket economies] . . . often compet[e]

with domestically set prices.  Therefore, sales into [a nonmarket economy] may very well not be

at prices that reflect the fair value of the merchandise."  (Id.)  Commerce excluded Plaintiffs'

---

[9]"[S]ubstantial evidence and arbitrary and capricious 'connote[] the same substantive
standard of review.'" Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 25 CIT 1150,
1156, 178 F. Supp. 2d 1305 (2001) (quoting Bangor Hydro-Elec. Co. v. FERC, 78 F.3d 659, 663
n.3 (D.C. Cir. 1996) (brackets in original).

price data, declaring that "sales prices into [a nonmarket economy] cannot be considered to be

'representative,' as required by the statute."  (Id.)  However, Commerce's determination is

missing an adequate explanation of (1) why Plaintiffs' sales should be treated as sales into

nonmarket economy; and (2) why Commerce treated Plaintiffs' price data differently than it

treats price data for sales from market-economy suppliers to nonmarket-economy buyers in

analogous antidumping cases.

>    **1.      Commerce did not adequately explain why it found that Plaintiffs' sales
>             should be treated as sales "into a nonmarket economy."**

Commerce did not adequately explain why it found that Plaintiffs' sales to unrelated

Korean trading companies should be treated as sales into a nonmarket economy.  Plaintiffs sold

OCTG to trading companies organized under the laws of and operating in Korea.  Korea is a

market economy.  Furthermore, Plaintiffs explained to Commerce that the price data they

submitted represents the invoice price between Plaintiffs and the Korean trading companies and

Commerce verified the accuracy of these data.  It was the Korean trading companies that sold the

OCTG to buyers in China.  However, the trading companies are unrelated to Plaintiffs, and

Commerce did not present a justification to attribute the unrelated trading companies' sales to

Plaintiffs.

Commerce made much of the fact that Plaintiffs' sales are properly classified as sales to

China.  This Court does not take issue with Commerce's requirement that respondents classify

sales as to a third country if, at the point the seller negotiates the sale, the seller knows, or should

have known, that the merchandise will be exported to that third country.  See LG Semicon Co.,

Ltd. v. United States, 23 CIT 1074, 1075 (1999).  At the time that Plaintiffs negotiated their sales

with the Korean trading companies, they knew that the Korean trading companies would resell

the OCTG to customers in China and, therefore, classified their sales to the Korean trading

companies as sales to China.  Yet, there is a difference between the underlined classification of Plaintiffs'

transactions and the underlying factual circumstances of them.[10]

        Plaintiffs are organized under and operate in Korea, a market economy, and are unrelated

to their Korean trading company customers.  It is trivial to say that, absent evidence to the

contrary, sales negotiated between unrelated parties operating in a market economy are assumed

to be at market prices.  The only factual distinction from a typical transaction between two

unrelated market-economy participants that Commerce pointed to was Plaintiffs' knowledge that

the merchandise would be resold to China (and, hence, Plaintiffs' classification of the sales as

Chinese).  However, Commerce did not explain the significance of Plaintiffs' knowledge that the

OCTG they sold to the Korean trading companies was destined for China.  Commerce does not

offer any explanation of why, or evidence that, the price between Plaintiffs and the trading

companies was affected by the country into which the subject merchandise would subsequently

be sold.  Further, Commerce does not explore why the factual circumstances of Plaintiffs'

transactions should be treated any differently than if the Korean trading companies had resold the

subject merchandise into a market economy or into a nonmarket economy without Plaintiffs'

---

        [10]Absent factual evidence of Plaintiffs' sales, Commerce might have been justified to fall
back on the classification of the sales.  However, the substantial evidence standard requires that
Commerce look at the whole record, including evidence that reasonably detracts from its
conclusion, when making a determination.  See Universal Camera Corp. v. NLRB, 340 U.S. 474,
488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly
detracts from its weight.").  Therefore, because Plaintiffs presented Commerce with persuasive
evidence that their sales were made on the basis of market factors, Commerce should have
addressed this evidence in its explanation.

knowledge.[11]  Without a logical or factual link between Plaintiffs' knowledge that the

merchandise was to be resold to China and the distorted prices within China, Commerce cannot

justify treating Plaintiffs' sales as sales into a nonmarket economy.  Because Commerce did not

provide a "reasoned explanation supported by a stated connection between the facts found and

the choices made," Elec. Consumers, 747 F.2d at 1513, this Court finds that Commerce's

decision to exclude Plaintiffs' price data is not supported by substantial evidence on the record.

> **2.      Commerce's treatment of Plaintiffs' price data is inconsistent with its usual
>          treatment of sales from market-economy sellers to nonmarket-economy
>          buyers.**

Even if Commerce had adequately explained why it treated Plaintiffs' sales to Korean

trading companies as sales into a nonmarket economy, Commerce's explanation is unsatisfactory

in another respect.  Commerce's treatment of Plaintiffs' price data is inconsistent with its usual

treatment of sales from market-economy sellers to nonmarket-economy buyers.  In nonmarket

cases, Commerce regularly calculates normal value using price data from sales between market-

economy sellers and nonmarket-economy buyers.  See 19 C.F.R. § 351.408(c)(1) (2006).  Here,

however, Commerce excluded Plaintiffs' price data on the ground that Plaintiffs (located in the

market economy of Korea) sold the merchandise to buyers located in China (a nonmarket

---

[11]There is nothing in the record to support Defendants-Intervenor's contention that
Plaintiffs' sales price to the trading companies was unduly influenced by the less-than-market-
price Defendants-Intervenor allege that the trading companies received from the Chinese buyers.
(Defs.-Int.'s Mem. 17.)  Further, Commerce made no findings–theoretical or empirical–that the
transactions were influenced by Plaintiffs' knowledge that the merchandise was destined for
China.  An agency decision will be reviewed on the grounds invoked by the agency, see SEC v.
Chenery Corp., 332 U.S. 194, 196 (1947), and the courts may not "supply a reasoned basis for
the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43.

economy).[12]  An agency acts impermissibly when it treats similar situations in a manner that is

"internally inconsistent," NSK, Ltd. v. United States, 390 F.3d 1352, 1357 (Fed. Cir. 2004), and

fails to "reasonably explain[] the inconsistency," id. at 1358.

        Consider a transaction between A, a seller of automobile engines operating in a market

economy, and B, an automobile manufacturer located in a nonmarket economy.  A sells an

automobile engine to B, which B uses to manufacture an automobile.  If B is investigated for

dumping automobiles, Commerce would calculate normal value for B's automobiles in a

different manner than in an ordinary antidumping case, like the instant one, where the respondent

is located in a market economy.  Instead of using the price at which B sells its automobiles,

Commerce would calculate normal value by adding together the costs of the various factors of

production of the automobile.  See 19 U.S.C. § 1677b(c).  Typically, Commerce estimates the

costs of the factors of production using the prices of the inputs in a market-economy country

similar to the nonmarket-economy country in which the respondent operates.  For example,

Commerce might use the price of a similar automobile engine in India to estimate the cost of the

engine B used to manufacture its automobile.

        However, where a respondent purchases an input from a market-economy supplier,

Commerce prefers to use the actual price the respondent paid for the input rather than an

estimated cost of the input.  See 19 C.F.R. § 351.408(c)(1).  The Court of Appeals for the Federal

Circuit has held that where a nonmarket respondent buys an input from a market-economy

---

        [12]As discussed above, Plaintiffs' sales were not made to Chinese buyers.  However, for
purpose of this discussion, this Court will assume that Plaintiffs sold to Chinese buyers to
highlight the inconsistency in Commerce's positions.

supplier "accuracy, fairness, and predictability are enhanced by using" the price paid for the

input, rather than the estimated cost.  Shakeproof Assembly Components Div. of Ill. Tool Works,

Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  Further, in Shakeproof, Commerce

stated that the sale between the market-economy supplier and the nonmarket-economy

respondent resulted in "an actual price determined by market economy forces" that was "both

reliable and accurate."  Id. at 1380 (quotation and citation omitted).  Thus, in the example above,

Commerce would use the price B paid to A for the automobile engine to calculate the normal

value of the automobile.

Yet, in the instant case, Commerce did not allow Plaintiffs to use similar price data to

calculate the normal value of OCTG.  Commerce excluded the price data for sales by Plaintiffs

(located in the market economy of Korea) to buyers located in China (a nonmarket economy).

Commerce did so on the ground that sales by Plaintiffs to the Chinese buyers "may very well not

be at prices that reflect the true value of the merchandise."[13]  (Issues & Decision Mem. 8.)  This

was merely an assumption on the part of Commerce, as the agency made no findings that the

actual prices paid to Plaintiffs did not reflect the fair value of the OCTG.

Applying the reasoning Commerce used in the instant case to the hypothetical outlined

above, Commerce would allow B to calculate the normal value of an automobile using the price

B paid to A for the automobile engine, but would not allow A to use that same price to calculate

---

[13]Commerce explained that foreign suppliers to nonmarket economies often compete with
domestically set prices.  (Issues & Decision Mem. 8.)  Because the domestic prices within a
nonmarket economy are "not meaningful measures of value" Commerce assumed that the sales
between market-economy suppliers and nonmarket-economy buyers would be similarly distorted.
(Id.)

the normal value of the engine.  Commerce's practice to accept the price in the former instance

while denying it in the latter is "internally inconsistent."  See NSK, 390 F.3d at 1357.  Either the

price of the sale between A and B is "an actual price determined by market economy forces" that

is "both reliable and accurate," Shakeproof, 268 F.3d at 1380, as Commerce claims in nonmarket

cases, or it is a price "that may very well not . . . reflect the fair value of the merchandise,"

(Issues & Decision Mem. 8), as Commerce claimed in the instant case.  It cannot be both.

The Government purports to explain the inconsistency by stating that in nonmarket cases

the price data is used to value only "a single input used in the calculation of normal value"

whereas in the instant case the price would serve as "the entire basis for normal value."  (Def.'s

Mem. 18.)  This is a distinction without a difference.  If the price between a market-economy

supplier and a nonmarket-economy buyer is a reliable price determined on the basis of market

principles, it should make no difference whether Commerce is using that price to calculate only

part or all of the normal value.  Contrariwise, if the price is distorted by virtue of being sold to a

buyer located in a nonmarket economy, Commerce would not be able to use it in either instance.

(See id. at 20 (Commerce must "disregard market-economy input purchases when there is

evidence that the prices for such inputs may be distorted.").)  Therefore, the Government's

distinction does not explain why Commerce accepts these prices to calculate factors of

production in nonmarket cases, but not to establish the price of the subject merchandise in the

instant case.

The Government's and Defendants-Intervenor's other attempt to distinguish the two

situations is similarly unpersuasive.  They contended that in the instant case the price must be

"representative," whereas in nonmarket cases the price need only be the "best information

available" for Commerce to use it.  (Def.'s Mem. 18; Defs.-Int.'s Mem. 8-9.)  As discussed

above, Commerce has found in the nonmarket case context that prices for sales from market-

economy sellers to nonmarket-economy buyers are "determined by market economy forces."

Shakeproof, 268 F.3d at 1380.  In the instant case, Commerce defined "representative" to mean

"determined on the basis of market principles."  (Issues & Decision Mem. 8.)  Therefore, there

appears to this Court no reason to treat the price data for sales between a market-economy

supplier and nonmarket-economy buyer differently in the two situations.  Because Commerce did

not sufficiently explain its inconsistent treatment of the price data, its finding that the Plaintiffs'

price data are unrepresentative "is arbitrary and impermissible."[14]  NSK, 390 F.3d at 1358.  On

remand, Commerce must give a persuasive explanation for the agency's inconsistent treatment of

these sales price data.

> **3.      This Court cannot at this point determine whether Commerce should select
>           Canada or China as the third-country comparison market for SeAH.**

An ancillary issue raised by the parties cannot be decided at this point.  Defendants-

Intervenor argue that China would not be the proper third-country comparison market for SeAH

---

[14]This Court finds that Commerce adequately distinguished the two instances cited by
Plaintiffs (Pls.' Br. 26), where Commerce accepted a respondent's Chinese sales price data to
calculate the respondent's normal value.  The first instance, OCTG from Argentina, Commerce
explained, was decided prior to the addition to the statute of the requirement that third-country
prices be "representative" and, therefore, does not support Plaintiffs' allegation that Commerce
has previously found Chinese prices to be "representative."  (Issues & Decision Mem. 10); see
also Oil Country Tubular Goods from Argentina, 60 Fed. Reg. 33,539, 33,540 (Dep't Commerce
June 28, 1995) (final determination of sales at less than fair value).  In the second instance,
Polyester Staple Fiber from Korea, Commerce explained that "no party raised the issue" and the
Chinese price data was accepted without objection.  (Issues & Decision Mem. 10); see also
Certain Polyester Staple Fiber from Korea, 67 Fed. Reg. 63,616, 63,617 (Dep't Commerce Oct.
15, 2002) (final results of antidumping duty administrative review).

even if Commerce found that Plaintiffs' sales to China are "representative." (Defs.-Int.'s Mem.

18.) If there are multiple third-country markets with eligible prices, Commerce selects as the

comparison market the country with the highest volume of sales of subject merchandise that is

most similar to that sold in the United States. 19 C.F.R. § 351.404(e). Defendants-Intervenor

contend that Canada would still be the proper comparison market if SeAH's sales to China were

not excluded because the merchandise SeAH sold to Canada was more similar to the U.S.

merchandise than that sold to China. (Defs.-Int.'s Mem. 19.)

However, it is premature for this Court to decide whether Canada or China should be

selected as SeAH's third-country comparison market. First, at this point, Canada is SeAH's only

viable third-country market. While this Court finds Commerce's decision to exclude China as a

viable third-country market unsupported by substantial evidence, the remand will afford

Commerce the opportunity to adequately explain its decision. Secondly, Commerce has not yet

made findings on the similarity of the OCTG exported by SeAH to both Canada and China as

compared to that sold to the United States. This Court's role is to vet Commerce's

determinations, not to make them in the first instance. See Nippon Steel Corp. v. United States,

458 F.3d 1345, 1352 (Fed. Cir. 2006). That said, if Commerce determines that the price of

Plaintiffs' Chinese sales is "representative," Commerce must determine, pursuant to 19 C.F.R.

§ 351.404(e), whether Canada or China should be selected as SeAH's third-country comparison

market.

## CONCLUSION

Because the final determination in <u>Oil Country Tubular Goods, Other Than Drill Pipe,</u>

<u>from Korea: Final Results of Antidumping Duty Administrative Review</u>, 71 Fed. Reg. 13,091

(Dep't Commerce Mar. 14, 2006), is not supported by substantial evidence on the record, this

Court grants Plaintiffs' Husteel Co., Ltd. and SeAH Steel Corp., Ltd. Rule 56.2 Motion for

Judgment upon the Agency Record and remands the final determination to the Department of

Commerce for further proceedings consistent with this opinion.

Upon consideration of the papers submitted by the parties, and upon due deliberation, it is

hereby

**ORDERED** that Plaintiffs' Motion for Oral Argument is denied; it is further

**ORDERED** that Plaintiffs' Motion for Judgment on the Agency Record is granted; it is
further

**ORDERED** that this case is remanded to the Department of Commerce ("Commerce") to
determine whether the price of Plaintiffs' sales for export to the People's Republic of China ("the
price") is "representative" within the meaning of 19 U.S.C. § 1677b(a)(1)(B)(ii)(I) (2000); it is
further

**ORDERED** that if Commerce determines that the price is "representative," Commerce
will determine pursuant to 19 C.F.R. § 351.404(e) whether China or Canada should be selected
as SeAH Steel Corp., Ltd.'s third-country comparison market; and it is further

**ORDERED** that if Commerce determines that the price is "representative," Commerce
will recalculate Plaintiffs' dumping margins accordingly; it is further

**ORDERED** that the remand results shall be filed no later than July 12, 2007; it is further

**ORDERED** that Plaintiffs may file papers with the Court indicating whether they are
satisfied or dissatisfied with the remand results no later than August 6, 2007; and it is further

      **ORDERED** that Defendant and Defendants-Intervenor may respond to Plaintiffs'
comments no later than August 27, 2007.

      **SO ORDERED.**


                                __/s/_Gregory_W._Carman___
                                    Gregory W. Carman

Dated: May 15, 2007
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk